**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| YSIDRO MORENO, JR., | ) | No. CV 13-8492-PLA |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on November 27, 2013, seeking review of the Commissioner's denial of his applications for Disability Insurance Benefits and Supplemental Security Income payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on December 13, 2013, and December 30, 2013. Pursuant to the Court's Order, the parties filed a Joint Stipulation on October 24, 2014, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on November 3, 1968.  [Administrative Record ("AR") at 131, 132.]  He has past relevant work experience as an office manager and sales driver.  [AR at 16, 254.]

On February 9, 2011, plaintiff filed an application for Disability Insurance Benefits, and on February 11, 2011, he filed an application for Supplemental Security Income payments.  [AR at 131, 132.]  In both applications, plaintiff alleged disability beginning on January 21, 2008.[1]  [AR at 10, 228, 233.]  After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 151.]  A hearing was held on September 18, 2012, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [AR at 25-60.]  A vocational expert ("VE") and plaintiff's friend also testified.  [AR at 51-55, 56-59.]  On October 5, 2012, the ALJ issued a decision concluding that plaintiff was not under a disability since January 21, 2008, the alleged onset date, through October 5, 2012, the date of the decision.  [AR at 10-18.]  When plaintiff's request for review of the hearing decision [AR at 5-6] was denied by the Appeals Council on September 20, 2013 [AR at 1-3], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam).  This action followed.

---

[1]    In early January 2008, plaintiff sustained a right lower leg injury in an ATV accident.  [AR at 447.]  A week or so after the accident he began displaying strange behavior.  [Id.]  A brain MRI showed multiple bilateral lesions, predominantly involving the white matter, and consistent with a demyelinating process.  [AR at 449.]  He was diagnosed with post-acute disseminated encephalomyelitis (see, e.g., AR at 599), and subsequently developed a seizure disorder.  [AR at 625.]  Although plaintiff told the medical consultants, Dr. Brawer and Dr. Singh, that he was in a coma for three or four months after the accident because of a tetanus shot he received [AR at 618, 625], the only treatment record seeming to relate to this is a note from Dr. Yafa Minazad on January 8, 2008, stating that plaintiff suffered from acute disseminated encephalomyelitis secondary to a tetanus shot, status post ten treatments of plasmophoresis.  [AR at 596.]  On September 23, 2008, Dr. Minazad did a follow up examination and again noted "1. Acute demyelinating encephalomyelitis secondary to tetanus shot with diffused demyelinating lesions. 2. Cognitive disturbance. 3. Paroxysmal episodes of memory loss and confusion. 4. Must rule out seizures." [AR at 599.]  Dr. Minazad does not mention three months of coma.  Nor does the Court find any treatment records reflecting that plaintiff was in a coma for three months at any time after his accident.

2

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010).

"Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (internal quotation marks and citation omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).   When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Ryan, 528 F.3d at 1198 (internal quotation marks and citation omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.").

### IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.      THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

/

/

1    **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

2          In this case, at step one, the ALJ found that plaintiff had not engaged in substantial gainful

3    activity since January 21, 2008, the alleged onset date.[2]  [AR at 12.]   At step two, the ALJ

4    concluded that plaintiff has the following severe impairments: "an affective disorder, organic brain

5    disorder and a questionable seizure disorder." [Id.] At step three, the ALJ determined that plaintiff

6    does not have an impairment or a combination of impairments that meets or medically equals any

7    of the impairments in the Listings.[3]  [Id.]  The ALJ further found that plaintiff retained the residual

8    functional capacity ("RFC")[4] to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a),

9    416.967(a)[5] as follows:

10               [C]laimant has the residual functional capacity to perform sedentary work . . . except
                 mentally, the claimant is limited to no public contact, simple routine tasks and no
11               more than occasional contact with coworkers and supervisors.  The claimant is also
                 [] given the usual seizure precautions of no work at unprotected heights, around
12               dangerous unguarded moving machinery, use of automotive equipment or pools of
                 water.

13

14   [AR at 14.]  At step four, based on plaintiff's RFC and the VE's testimony, the ALJ concluded that

15   plaintiff is unable to perform any of his past relevant work as an office manager and sales driver.

16   [AR at 16.]  At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the

17   ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff

18   can perform, including work as a "nut sorter" (Dictionary of Occupational Titles ("DOT") No.

19   _____

20        [2]   The ALJ concluded that plaintiff met the insured status requirements of the Social
          Security Act through June 30, 2010.  [AR at 12.]

21
          [3]   See 20 C.F.R. pt. 404, subpt. P, app. 1.
22

23        [4]   RFC is what a claimant can still do despite existing exertional and nonexertional
          limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
          three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
24        the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149,
          1151 n.2 (9th Cir. 2007).
25

26        [5]   20 C.F.R. § 416.967(a) defines "sedentary work" as work involving "lifting no more than 10
          pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
27        tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of
          walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking
28        and standing are required occasionally and other sedentary criteria are met."

521.687-086), "final assembler" (DOT No. 713.687-018), and "envelope addresser" (DOT No. 209.587-010). [AR at 17, 57-58.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from January 21, 2008, the alleged onset date, through October 5, 2012, the date of the decision. [AR at 18.]

## V.

## <u>THE ALJ'S DECISION</u>

Plaintiff argues that the ALJ committed reversible error because he failed to fully and fairly develop the record. [Joint Stipulation ("JS") at 3.] In particular, plaintiff argues that the ALJ should have had plaintiff attend another mental and physical consultative examination because both of the original consultative examinations, which took place on September 24, 2009, and October 1, 2009, respectively, were conducted prior to the filing of plaintiff's current applications, and three years prior to the September 18, 2012, hearing.[6] [Id.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

### A.   Applicable Law

As a general matter, it is plaintiff's duty to prove he is disabled. <u>Mayes</u>, 276 F.3d at 459; 42 U.S.C. § 423(d)(5)(A) (claimant must furnish medical and other evidence of his disability); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have impairment(s) and how severe it is during the time you say you are disabled").

While plaintiff bears the burden of proving disability, the ALJ in a social security case has an independent, "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" <u>Smolen v. Chater</u>, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting <u>Brown v. Heckler</u>, 713 F.2d 441, 443 (9th Cir. 1983)); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001) (citation omitted). This duty is triggered only when there is ambiguous

---

[6]   Plaintiff filed a prior application for disability benefits in 2009 that was "apparently dismissed for an untimely request for a hearing without good cause and thus never went to the administrative hearing stage." [JS at 2 [citing AR at 62, 65].]

6

1   evidence or when the record is inadequate to allow for proper evaluation of the evidence.  Mayes,

2   276 F.3d at 459-60.  This principle does not allow a plaintiff to shift his own burden of proving

3   disability to the ALJ.  Id. at 459.

4           One of the tools available to an ALJ in developing a record is the consultative examination.

5   See 20 C.F.R. §§ 404.1512(e), 404.1517 ("If your medical sources cannot or will not give us

6   sufficient medical evidence about your impairment for us to determine whether you are disabled

7   . . . , we may ask you to have one or more physical or mental examinations or tests.").  The

8   Commissioner has broad latitude in ordering such an examination when there is ambiguity or

9   insufficiency in the record.  Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation

10  omitted).  A consultative examination is normally required where there is an indication of a change

11  in a claimant's condition that is likely to affect the claimant's ability to work, and the current severity

12  of the claimant's impairment is not established.  See 20 C.F.R. § 404.1519a(b)(4).

13

14  **B.   Analysis**

15      **1.   Relevant Time Period**

16          Preliminarily, defendant argues that plaintiff's eligibility for Disability Insurance Benefits

17  ended on June 30, 2010, when his insured status ended.  [JS at 6.]  In order to qualify for Title II

18  Disability Insurance Benefits, plaintiff must show disability prior to the date he was last insured.

19  Soc. Sec. Ruling 83-10[7] ("Under title II, a period of disability cannot begin after a worker's disability

20  insured status has expired.")  Defendant correctly argues, therefore, that the period between

21  January 21, 2008, the alleged onset date, and June 30, 2010, is "especially relevant," and the two

22  consultative examinations were "right at the heart of the relevant period for establishing eligibility

23  for Title II benefits."  [Id.]

24

25  _____

26  [7]   "The Commissioner issues Social Security Rulings [("SSRs")] to clarify the Act's
    implementing regulations and the agency's policies.  SSRs are binding on all components of the
27  [Social Security Administration].  SSRs do not have the force of law.  However, because they
    represent the Commissioner's interpretation of the agency's regulations, we give them some
28  deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."
    Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

1    However, defendant fails to account for the fact that plaintiff also applied for Supplemental

2    Security Income payments, which are not payable for any months prior to the filing of an

3    application, and the earliest month for which a claimant can receive benefits is the month following

4    the month the claimant filed the application.  20 C.F.R. § 416.335; see also id. § 416.501; 42

5    U.S.C. § 1382(c)(7).  Thus, the relevant time period concerning plaintiff's disability for purpose of

6    payments of Supplemental Security Income began on February 11, 2011, the date of his

7    application.  Plaintiff must show he was disabled on or before that date.

8    Defendant also fails to consider that medical evidence generated after the expiration of a

9    claimant's insured status may be relevant in determining a claimant's pre-expiration medical

10   condition; such evidence may not be disregarded solely because it was generated retrospectively.

11   Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988).

12

13           **2.    An Additional Mental Health Consultative Examination Should Have Been**
             **Ordered**
14

15   On September 24, 2009, Steven I. Brawer, Ph.D., completed a psychological assessment

16   of plaintiff.  [AR at 617-24.]  Dr. Brawer diagnosed plaintiff with a cognitive disorder, NOS, status

17   post acute disseminated encephalomyelitis in 2008, evidenced by a likely decline in

18   cognitive/memory functioning, relative to premorbid capabilities, given plaintiff's work/educational

19   history; and depressive disorder, secondary to general medical condition, given the report of

20   chronic depressed mood, sadness over losses, irritability, insomnia, fatigue, constriction of

21   interest, anhedonia, and restriction of daily activities.  [AR at 623.]  Dr. Brawer also described

22   plaintiff's seizure disorder as "partially controlled."  [Id.]  He opined that plaintiff would be "able to

23   learn a simple, repetitive task and could likely perform some detailed, varied or complex tasks."

24   [Id.]  He stated that plaintiff's ability to sustain attention and concentration for extended periods

25   of time "may be mildly diminished, due to cognitive and emotional factors," and noted that during

26   testing plaintiff demonstrated "mildly diminished attention, concentration, persistence, and pace

27   in completing tasks."  [Id.]  He also found "concentration/short-term memory weakness, depressive

28

1  symptoms and somatic complaints, which may result in mild limitations in ability to effectively
2  manage customary work stress and persists for a regular workday." [Id.]  He noted "mild
3  limitations in ability to sustain cooperative relationships with co-workers and supervisors," and
4  stated that plaintiff "may function most optimally in a semi-isolated work setting." [AR at 623-24.]

5  The ALJ relied on Dr. Brawer's report in determining that plaintiff's mental impairments did
6  not meet or medically equal the paragraph B criteria of Listings 12.02 and 12.04.[8] [AR at 12-13.]
7  The ALJ determined that plaintiff had mild restrictions or difficulties in activities of daily living,
8  social functioning, and concentration, persistence or pace, and no episodes of decompensation
9  of extended duration. [AR at 13.]  He also relied on Dr. Brawer's findings that plaintiff has some
10 concentration and short-term memory weakness, depressive symptoms, and somatic complaints
11 that might result in mild limitations in the ability to effectively manage customary work stress and
12 pressure, but does appear capable of following a routine and organizing himself for basic tasks.
13 [Id.]  He noted that plaintiff may have difficulty sustaining motivation because of his somatic
14 complaints.  [Id.]

15 The ALJ also considered some of plaintiff's mental health records dated after Dr. Brawer's
16 examination.  [AR at 15.]  First, he discussed records from Arcadia Mental Health ("AMH"),
17 specifically a March 14, 2012, discharge summary indicating that plaintiff was not compliant with
18 his medication and had "discontinued services for an unknown reason." [Id. [see id. at 928].]  He
19 notes that on intake on April 20, 2011, plaintiff was diagnosed with a mood disorder due to his
20 medical condition, his "grooming and hygiene were average, eye contact normal, motor activity
21 calm and speech unimpaired, [and he was] oriented in all spheres and memory unimpaired." [AR
22 at 15-16 [citing id. 939-41].]

23

24 _____

25   [8]   Listing 12.02 describes organic mental disorders; Listing 12.04 describes affective
   disorders.  20 C.F.R. pt. 404, subpt. P, app. 1.  To satisfy paragraph B criteria, the mental
26 impairments must result in at least two of the following:  marked restrictions of activities of daily
   living; marked difficulties in maintaining social functioning; marked difficulties in maintaining
27 concentration, persistence, or pace; or repeated episodes of decompensation, each of extended
   duration (i.e., three episodes within one year, or an average of once every four months, each
28 lasting for at least two weeks).  Id.

1    The ALJ's limited "discussion" of a portion of the intake and discharge summaries from

2    AMH paints only a partial picture, however.  The April 20, 2011, intake records from AMH also

3    note the following:

> [Plaintiff] was hospitalized twice [in the past] due to symptoms which included:  prior suicidal ideations with a plan, depression, sleeplessness for five days, auditory hallucinations . . . paranoid thoughts of being watched and followed and of being heard while talking on the phone and fear of being harmed, mood swings, irritability, excessive energy, and a lack of concentration.  The client reported one suicide attempt by "cutting my wrists with a plastic knife" one month prior.

8    [AR at 928, 945-48.]  The past hospitalizations referred to include a 2010 hospitalization at

9    Arrowhead Regional Medical Center, a nine-day "hospitalization at PARK Side West Hospital

10   ending 03-31-11," and treatment at Exodus where plaintiff "was not admitted but he was suicidal."

11   [AR at 945, 946.]  The ALJ never mentions these notes.

12   The only other mental health record mentioned by the ALJ in his decision was regarding

13   "an admission [at the Phoenix Clinic] in November 2011 for a psychotic disorder":

> The claimant presented 5150 by police because he was suicidal.  Apparently, he was experiencing auditory hallucinations telling him to hurt himself.  The claimant was compliant with medications and experienced no adverse side effects and over the course of two days his voices became manageable.  He expressed that he was feeling 100% better and was discharged with medication including Risperdal.

17   [AR at 15 [citing id. at 950-63].]  What the ALJ does not mention is that the "admission" in

18   November 2011 was actually two admissions:  November 16, 2011, to November 17, 2011, and

19   again from November 17, 2011, to November 18, 2011.  [AR at 957.]  In fact, February 22, 2012,

20   records also reference the fact that since December 2010, plaintiff had a total of seven psychiatric

21   hospitalizations, including Canyon Ridge Hospital in December 2010; the two admissions in

22   November 2011; and twice at San Bernardino Community.  [AR at 957, 961-63.] These notes also

23   state that in November 2011, plaintiff "tried to cut [his] wrist." [AR at 961.]  Again, the ALJ never

24   mentions any of these additional hospitalizations.

25   /

26

27

28

10

1    Also never mentioned by the ALJ, on January 27, 2011, *prior* to plaintiff's application for

2    Supplemental Security Income, plaintiff presented at Arrowhead Regional Medical Center pursuant

3    to a 5150 stating he had been "feeling depressed" and was planning to jump in front of a metro

4    train.  [AR at 630-40, 695.]  As a result, on January 29, 2011, plaintiff was admitted to Canyon

5    Ridge Hospital where he stayed until discharged on January 31, 2011.  [AR at 668-77.]  Plaintiff

6    was discharged with a diagnosis of Major Depression and a Global Assessment of Functioning

7    score of 50.[9]  [AR at 668.]

8    Although the ALJ stated that he had "considered all of the medical evidence," he failed to

9    mention, much less address, many of plaintiff's treatment records.[10]  [See AR at 12, 14.]  An ALJ

10   must consider all of the relevant evidence in the record and may not point to only those portions

11   of the records that bolster his findings.  See, e.g., Holohan, 246 F.3d at 207-08 (holding that an

12   ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others); Aukland

13   v. Massanari, 257 F.3d 1033, 1035 (9th Cir.  2001) ("[T]he [ALJ]'s decision 'cannot be affirmed

14   simply by isolating a specific quantum of supporting evidence.'") (citing Sousa v. Callahan, 143

15   F.3d 1240, 1243 (9th Cir. 1998)); see also Reddick, 157 F.3d at  722-23 (It is impermissible for

16   the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all

17   parts of the testimony and reports."); Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004)

18   ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that

19

20   _____

21   [9]    A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's
     overall level of functioning.  It is rated with respect only to psychological, social, and occupational

22   functioning, without regard to impairments in functioning due to physical or environmental limitations.
     American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")

23   at 32 (Am. Psych. Ass'n, 4th ed. 2000).  A GAF score in the range of 41-50 indicates serious
     symptoms (e.g., suicidal ideation, obsessional rituals, frequent shoplifting) or any serious impairment

24   in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Id. at 34.

25   [10]   The regulations define medical opinions as "statements from physicians and psychologists or
     other acceptable medical sources that reflect judgments about the nature and severity of your

26   impairment(s), including your symptoms, diagnosis, and prognosis, what you can do despite your
     impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  As discussed

27   supra, these records contain information regarding the nature and severity of plaintiff's mental

28   impairments and indicate a possible change in his condition.

are favorable to a finding of nondisability."); <u>Whitney v. Schweiker</u>, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted).

As mentioned above, the relevant period for purposes of the disability determination commenced, at the latest, prior to February 11, 2011.  The ALJ simply ignored a great deal of relevant medical information between December 2010 and October 5, 2012 (the date through which the ALJ determined plaintiff was not disabled), relating to plaintiff's mental health condition, some of it prior to plaintiff's February 11, 2011, application for Supplemental Security Income. This evidence may be relevant to determining plaintiff's condition prior to the expiration of his eligibility for benefits, and may not be disregarded solely because it was generated retrospectively. <u>Smith</u>, 849 F.2d at 1225.  Indeed, this is especially crucial here, where it appears that in determining plaintiff's RFC, the ALJ "cherry-picked" from portions of only two of plaintiff's mental health records, both of which are dated after the relevant period, and ignored others, including the pre-application January 2011 hospitalization record.

Dr. Brawer conducted his consultative mental examination on September 24, 2009, and, therefore, did not have the benefit of plaintiff's more recent medical records.  Because the later records appear to reflect changes in plaintiff's mental health condition that are likely to affect plaintiff's ability to work, and the current severity of plaintiff's mental and physical impairments and their effect on his functional limitations is not established, the Court agrees with plaintiff that the ALJ should have had plaintiff attend a more recent consultative examination to assess his mental impairments and limitations.

### 3.    An Additional Physical Consultative Examination Should Have Been Ordered

On October 1, 2009, Jagvinder Singh, M.D., conducted an internal medicine consultation. [AR at 625-29.]  Dr. Singh noted that plaintiff reported weakness in his right leg, but there were no signs of a neurologic deficit or muscle weakness; plaintiff's reflexes were within normal limits; plaintiff used a cane to walk but was observed walking in the parking lot without difficulty and without the cane; plaintiff has a grand mal seizure disorder and his last seizure was two weeks

1  prior to the examination; and plaintiff has auditory hallucinations.  [AR at 629.]  Dr. Singh opined

2  that plaintiff can stand and walk for between four and six hours with breaks; can sit without

3  restriction; does not need an assistive device; is able to lift and carry twenty-five pounds

4  occasionally and ten pounds frequently; might have difficulty with balancing; and should avoid

5  working at heights, operating heavy machinery, or working near a source of fire or water.  [Id.]

6      With respect to plaintiff's physical impairments, the ALJ determined in part that plaintiff had

7  the severe impairment of a "questionable seizure disorder."  [AR at 12.]  He further noted that

8  "[a]lthough the claimant testified to having a seizure disorder, there is no formal medical diagnosis

9  of record or any objective medical report."[11]  [Id.]  He stated that he gave plaintiff "the benefit of

10  all doubt in finding a severe seizure disorder."  [Id.]

11      As with plaintiff's mental health condition, however, there also is medical evidence in the

12  record that plaintiff's seizure condition may have changed after Dr. Singh's examination in such

13  a way that it might affect plaintiff's ability to work.  For instance, on January 16, 2011, plaintiff

14  experienced a seizure and went to the emergency room [AR at 695]; on January 19, 2011, he had

15  another seizure and went to the emergency room [id.]; and the records on January 19, 2011,

16  indicate "1 seizure per week x 2 years until recent increase in frequency in the last 3 days."  [AR

17  at 642.]  Records in November 2011 and June 2012, also indicate hospital visits due to seizures.

18  [See, e.g., AR at 840-46, 855-56.]

19      Dr. Singh conducted his consultative physical examination on October 1, 2009, and,

20  therefore, did not have the benefit of plaintiff's more recent medical records.  Because the later

21  records appear to reflect changes in plaintiff's physical condition that are likely to affect plaintiff's

22  ability to work, and the current severity of plaintiff's mental and physical impairments and their

23  effect on his functional limitations is not established, the Court agrees with plaintiff that the ALJ

24

25
_____

26  [11]    This statement is puzzling as the medical records seem to consistently include a diagnosis
of seizure disorder.  Even Dr. Singh, the internal medicine consultant, in his October 1, 2009, report,
27  indicated that plaintiff had a history and diagnosis of grand mal seizures for which he takes
medication, and noted that plaintiff's last seizure was two weeks prior to the examination.  [AR at 625,
28  629.]

should have had plaintiff attend a more recent consultative physical examination to assess his physical impairments and limitations.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

Here, there are outstanding issues that must be resolved before a final determination can be made.  However, in an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, the ALJ shall allow plaintiff to supplement the record with any new medical evidence.  Second, the ALJ shall fully develop the record relating to plaintiff's mental and physical impairments by ordering additional consultative examinations.  Third, based on his reevaluation of the medical evidence, including the new consultative examinations, the ALJ shall determine plaintiff's RFC.  Fourth, the ALJ shall determine at step five,[12] with the assistance of a VE if needed, whether plaintiff is able to perform other work existing in significant numbers in the regional and national economies.

/

/

---

[12]   Nothing in this Opinion is intended to disturb the ALJ's step four finding that plaintiff is unable to perform his past relevant work. [AR at 16.]

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: January 9, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE